## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Honorable Rukhsanah L. Singh |
| v. | : | Mag. No. 25-14036 (RLS) |
| RAHEEM MONTGOMERY, SR. AND KRISTEN OVERTON-SCOTT | : | **CRIMINAL COMPLAINT** |

I, Joshua Suazo, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

/s/ Joshua Suazo
_____
Joshua Suazo, Special Agent
Federal Bureau of Investigation

Attested to by telephone pursuant to
Fed. R. Crim. P. 4.1(b)(2)(A)
on August 12, 2025,
in the District of New Jersey

Honorable Rukhsanah L. Singh
United States Magistrate Judge
Name and Title of Judicial Officer

Signature of Judicial Officer

RECEIVED

AUG 12 2025

AT 8:30_____M
CLERK, U.S. DISTRICT COURT - DNJ

**ATTACHMENT A**

**COUNT ONE**
**(Conspiracy to Distribute and Possess with Intent**
**to Distribute a Controlled Substance)**

From in or around November 2024 through in or around May 2025, in Ocean County, in the District of New Jersey and elsewhere, the defendants,

**RAHEEM MONTGOMERY, SR. and**
**KRISTEN OVERTON-SCOTT,**

knowingly and intentionally conspired and agreed with each other and others to distribute and possess with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of N-(4-Fluorophenyl)-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide ("p-fluorofentanyl"), an analogue of fentanyl and a Schedule I controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

In violation of Title 21, United States Code, Section 846.

**ATTACHMENT B**

I, Joshua Suazo, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents and other items of evidence. Where statements of others are related herein, they are related in substance and part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## I. BACKGROUND

1. Beginning in or around June 2024, law enforcement conducted an investigation into unlawful drug-trafficking activities by defendant RAHEEM MONTGOMERY, SR. ("MONTGOMERY, SR."). As described below, the investigation included multiple purchases of narcotics, including pressed fentanyl pills and fentanyl powder, from defendants MONTGOMERY, SR. and KRISTEN OVERTON-SCOTT ("OVERTON") by an FBI undercover employee (the "UC").

## II. UNDERCOVER PURCHASES

2. As noted above, during the investigation, the UC executed multiple undercover purchases of narcotics from MONTGOMERY, SR. and OVERTON, some of which are summarized below.

### The November 27, 2024 Undercover Purchase

3. From on or about November 25, 2024 through on or about November 27, 2024, MONTGOMERY, SR., using a telephone facility ending in 6969 (the "6969 Facility"), communicated with the UC through a series of telephone calls, including WhatsApp video calls, and WhatsApp text messages. During these communications, the UC arranged to meet MONTGOMERY, SR. at a service area located off the Garden State Parkway in Middlesex County, New Jersey (the "Service Area") on or about November 27, 2024 for the purpose of purchasing approximately 500 suspected fentanyl pills from MONTGOMERY, SR.

4. Prior to the meeting with MONTGOMERY, SR., on or about November 27, 2024, law enforcement provided the UC with an amount of money to make the undercover purchase from MONTGOMERY, SR., equipped the UC with a covert recording device to record the transaction with MONTGOMERY, SR., and established surveillance at the Service Area.

5.     Thereafter, the UC proceeded to the Service Area and met with MONTGOMERY, SR. inside the food court.  During the meeting, MONTGOMERY, SR. advised the UC that he was providing the UC with an additional 200 suspected fentanyl pills on consignment, meaning that the UC would pay MONTGOMERY, SR. for the 200 additional pills on a later date.  In addition, MONTGOMERY, SR. advised that he was also providing the UC with samples of heroin and ecstasy pills.  MONTGOMERY, SR. told the UC that, moving forward, he would sell heroin to the UC at a price of approximately $56 per gram if the UC purchased the heroin in increments of 100 grams or more.

6.     Thereafter, MONTGOMERY, SR. and the UC entered the men's restroom, where the UC handed MONTGOMERY, SR. the money that law enforcement had provided for the undercover purchase.  In exchange, MONTGOMERY, SR. handed the UC a clear plastic zip-lock style bag containing approximately 662 blue pills and approximately four suspected ecstasy pills, as well as another bag containing approximately five wax folds of suspected heroin.  MONTGOMERY, SR. and the UC then exited the restroom and departed the Service Area.[1]

7.     The suspected narcotics purchased from MONTGOMERY, SR. were subsequently submitted to a law enforcement laboratory for chemical analysis.  The approximately 662 blue pills tested positive for fentanyl and p-fluorofentanyl with a net weight of approximately 64.19 grams.  The approximately four suspected ecstasy pills tested positive for methamphetamine with a net weight of approximately 1.578 grams.  The approximately five wax folds of suspected heroin tested positive for heroin and fentanyl with a net weight of approximately 0.144 grams.

**The December 10, 2024 Undercover Purchase**

8.     On or about December 8, 2024, MONTGOMERY, SR. (using the 6969 Facility), communicated with the UC via a WhatsApp video call.  During this call, the UC arranged to meet MONTGOMERY, SR. at the Service Area on or about December 10, 2024 for the purpose of purchasing approximately 100 grams of heroin/fentanyl from MONTGOMERY, SR.

9.     Prior to the meeting with MONTGOMERY, SR., on or about December 10, 2024, law enforcement provided the UC with an amount of money to make the undercover purchase from MONTGOMERY, SR., equipped the UC with a covert recording device to record the transaction with MONTGOMERY, SR., and established surveillance at the Service Area.

---

[1] Due to a malfunction with the covert recording device, the meeting between the UC and MONTGOMERY, SR. on or about November 27, 2024 was not recorded.

10.     Thereafter, the UC proceeded to the Service Area and met with MONTGOMERY, SR. inside the food court.  Following a short conversation, MONTGOMERY, SR. and the UC entered the men's restroom.  There, inside a handicapped stall, the UC handed MONTGOMERY, SR. the money that law enforcement had provided for the undercover purchase and, in exchange, MONTGOMERY, SR. handed the UC a clear plastic zip-lock style bag containing a quantity of suspected heroin/fentanyl and another bag containing approximately 21 pressed blue pills.

11.     During this meeting inside the men's restroom, MONTGOMERY, SR. also stated that he had a large quantity of ecstasy pills inside his vehicle in the parking lot and agreed to provide them to the UC on consignment with the understanding that the UC would repay MONTGOMERY, SR. for the ecstasy pills on a later date.  The UC and MONTGOMERY, SR. then exited the restroom, and the UC sat at a table in the food court area while MONTGOMERY, SR. walked out to the parking lot and entered a small black Chevrolet vehicle bearing New Jersey license plates (the "Chevrolet").  A short time later, MONTGOMERY, SR. exited the Chevrolet, walked back into the food court, and sat down at the table with the UC.  MONTGOMERY, SR. then removed a red knit skull cap from his jacket and placed it into a bag that the UC was carrying.  Inside the red knit skull cap was a plastic bag containing approximately 840 suspected ecstasy pills, in an assortment of colors, and a quantity of loose powder.  MONTGOMERY, SR. and the UC then exited the food court and departed the Service Area.

12.     The suspected narcotics obtained from MONTGOMERY, SR. were subsequently submitted to a law enforcement laboratory for chemical analysis. The approximately 21 blue pills tested positive for fentanyl with a net weight of approximately 2.078 grams.  The approximately 840 suspected ecstasy pills tested positive for methamphetamine with a net weight of approximately 182.154 grams.  The suspected heroin/fentanyl tested positive for heroin, fentanyl, and p-fluorofentanyl with a net weight of approximately 99.849 grams.

**The January 8, 2025 Undercover Purchase**

13.     On or about December 13, 2024, MONTGOMERY, SR. was arrested by the New Jersey State Police following an earlier stop and search of a vehicle occupied by MONTGOMERY, SR. and another individual, during which law enforcement recovered multiple illegal firearms.  MONTGOMERY, SR. was charged with numerous firearms-related offenses and subsequently appeared before the Monmouth County Superior Court on those charges, at which time the court granted the prosecutor's motion to detain MONTGOMERY, SR. pending trial.  Since his arrest on or about December 13, 2024, MONTGOMERY, SR. has been incarcerated at the Monmouth County Correctional Institution.

14.    On or about December 19, 2024, OVERTON, using a telephone facility ending in 3227 (the "3227 Facility") spoke with MONTGOMERY, SR. on a recorded jail call.  During the call MONTGOMERY, SR. told OVERTON that the UC still owed MONTGOMERY, SR. approximately $1,400.  MONTGOMERY, SR. instructed OVERTON to use his cell phone to call the UC and let the UC know that MONTGOMERY, SR. had been arrested.  MONTGOMERY, SR. further instructed OVERTON to tell the UC that MONTGOMERY, SR. still had a large quantity of fentanyl pills for sale, and to find out if the UC was interested in purchasing additional fentanyl pills from MONTGOMERY, SR.

15.    Later that same date, on or about December 19, 2024, the UC received a WhatsApp call from the 6969 Facility and spoke with OVERTON. During this call, OVERTON advised the UC that MONTGOMERY, SR. wanted the UC to know that MONTGOMERY, SR. had been arrested for firearms related offenses.  OVERTON also told the UC that there was "something else" that she was supposed to tell the UC but she could not recall what it was at the moment.  OVERTON stated that she would contact the UC again after speaking with MONTGOMERY, SR.

16.    The following day, on or about December 20, 2024, OVERTON (using the 3227 Facility) again spoke with MONTGOMERY, SR. on a recorded jail call.  During this call, OVERTON and MONTGOMERY, SR. engaged in the following conversation:

| | |
|---|---|
| OVERTON: | How much is [the UC] supposed to have for you again?  Seven for him, and he supposed to have? |
| MONTGOMERY, SR.: | No, no, no.  He gotta give me 1,400 dollars. |
| OVERTON: | Yeah, I said how much he supposed to have for you.  You didn't hear what I said? |
| MONTGOMERY, SR.: | Oh, 1,400 dollars.  But I have 700 more for him. |
| OVERTON: | Yeah, okay. |
| MONTGOMERY, SR.: | Don't put 700 more dollars, just put 700 more. |
| OVERTON: | I wasn't gonna write it, I was gonna call him back. |

MONTGOMERY, SR.:      Oh, okay.

17.    Approximately six days later, on or about December 26, 2024, the UC and OVERTON (using the 6969 Facility) exchanged the following text messages via WhatsApp:

| Time | Sender | Recipient | Message |
|---|---|---|---|
| 9:19 p.m. | UC | OVERTON | Hey did he ever tell u what to tell me?  LMK [meaning "let me know"] Merry christmas |
| 9:21 p.m. | OVERTON | UC | He told me to just do whatever y'all had going on.  To pick up 1400 and 7 for you |
| 9:21 p.m. | OVERTON | UC | Merry Christmas |
| 9:22 p.m. | UC | OVERTON | Oooo word u didn't say u had his [emojis of 3 red and white prescription pills] |
| 9:22 p.m. | UC | OVERTON | Blues?  Yeah I got his bread |

18.    The following day, on or about December 27, 2024, at approximately 9:16 a.m., OVERTON (using the 3227 Facility) again spoke with MONTGOMERY, SR. on a recorded jail call.  During this call, OVERTON and MONTGOMERY, SR. engaged in the following conversation:

OVERTON:      So, look, [the UC] finally called back.

MONTGOMERY, SR.:      Okay.

OVERTON:      But, since [another coconspirator ("CC-1")] took all those, I don't have nothing for [the UC] now.

MONTGOMERY, SR.:      No, no, no.  I got them.  If you look in the small compartment, its 200 in there and [another coconspirator ("CC-2")] got like

|  | damn near 500 of mine that he waiting to fucking - I keep telling him to bring my shit back down.  So that would be 700. |
|---|---|
| OVERTON: | Oh, okay.  Are you sure?  When I look in the little part I will find it? |
| MONTGOMERY, SR.: | It's two small, yeah, it's two little, small ones, its two little, small wraps.  You'll see it. |

19.    Later that same date, at approximately 9:04 p.m., OVERTON (using the 6969 Facility) spoke to the UC via a WhatsApp video call.  During this call, OVERTON and the UC made arrangements to meet for the transaction the following week.

20.    On or about January 8, 2025, the UC communicated with OVERTON (using the 6969 Facility) via a WhatsApp video call and text messages.  During these communications, the UC arranged to meet with OVERTON for the transaction later that day at a restaurant located in Toms River, New Jersey (the "Restaurant").

21.    Prior to the transaction, law enforcement provided the UC with an amount of money to make the undercover purchase from OVERTON, equipped the UC with a covert recording device to record the transaction, and established surveillance at the Restaurant.  Thereafter, the UC proceeded to the Restaurant and met with OVERTON inside the Restaurant.

22.    During the meeting, OVERTON advised the UC that she only had approximately 600 blue pills to sell to the UC but explained that she could obtain more if the UC wanted to purchase more in the future.  The UC agreed to purchase the approximately 600 blue pills and handed OVERTON a shoulder bag containing the money that law enforcement had provided for the undercover purchase, explaining that a portion of the funds represented the money that the UC owed MONTGOMERY, SR. from the previous undercover purchase on or about December 10, 2024 and that the remainder of the cash was for the approximately 600 blue pills.  OVERTON removed the money from the shoulder bag and placed it into her own bag.  OVERTON then produced two plastic bags and an over-the-counter pill bottle, each containing quantities of blue pills (approximately 578 blue pills in total), placed them into the UC's shoulder bag, and handed the shoulder bag back to the UC.  OVERTON told the UC to let her know if any of the pills were broken and, if so, OVERTON would "get more" and "make up for it" the next time they meet.

23.    The UC then asked OVERTON whether MONTGOMERY, SR. had mentioned anything to her about the "dog food," meaning heroin/fentanyl

powder. OVERTON responded in the negative and asked how much the UC needed. The UC stated that he/she wanted to purchase approximately 100 grams. OVERTON advised the UC that she had approximately 137 grams of heroin/fentanyl powder in a vacuum-sealed bag at her house and asked if the UC wanted to purchase that amount from her. The UC responded affirmatively and told OVERTON to make sure that MONTGOMERY, SR. was "still good with the number though," meaning the price per gram to which the UC and MONTGOMERY, SR. had previously agreed. OVERTON then asked the UC what price the UC and MONTGOMERY, SR. had agreed upon, to which the UC responded, "56," meaning $56 per gram. OVERTON agreed to hold on to the approximately 137 grams of heroin/fentanyl powder in her possession and asked when the UC would be coming back to the area for another transaction with her. The UC responded that he/she would return in approximately two weeks.

24.     During the meeting, OVERTON also provided the UC with her own telephone number (*i.e.*, the 3227 Facility) and told the UC to use the 3227 Facility to contact her in the future. Thereafter, OVERTON exited the Restaurant, entered her vehicle, and departed the area.

25.     The approximately 578 blue pills that the UC purchased from OVERTON were subsequently submitted to a law enforcement laboratory for chemical analysis. The blue pills tested positive for fentanyl with a net weight of approximately 59.360 grams.

26.     Approximately 20 minutes after leaving the meeting with the UC at the Restaurant, OVERTON again spoke with MONTGOMERY, SR. on a recorded jail call. During this call, OVERTON and MONTGOMERY, SR. engaged in the following conversation:

| OVERTON: | I gotta ask you a question? I need you to be real. I know you can't talk on this phone. But... |
| --- | --- |
| MONTGOMERY, SR.: | I'll try to say it as best I can. |
| OVERTON: | Uh-huh. I'm trying to remember what he called it. Dog food? |
| MONTGOMERY, SR.: | Yeah. Who? |
| OVERTON: | [The UC]. |
| MONTGOMERY, SR.: | Oh, he asked if I had any? |
| OVERTON: | Yes. |

MONTGOMERY, SR.:     Yes.  Yes.

OVERTON:             It's better to just go with him, right?

MONTGOMERY, SR.:     Word is bond.  I was sitting here thinking that.  Remember what I was going to give to [CC-2]?

OVERTON:             Yeah, exactly. But [CC-2] want to meet in the morning.  Now, I'm about to say, nah, I'm giving that to [the UC].  Because remember what you told me seven dollars?

MONTGOMERY, SR.:     Nah.  No, it's more than 70, it's more than 70 that way.  I'ma sell him anything.

OVERTON:             No, no, no.  Two different things.  So, yeah, I'm gonna save the dog food for [the UC].  I'm gonna save that for him, right? That's better, right?

MONTGOMERY, SR.:     No, no.  I'm telling you.  That the other thing too.  You can give him that too.  But you tell him that's straight whatever it is, so he might, uh, he can leave it like that as is.  He can leave it as is, but it's gonna be strong.  I don't know if he knows how to, you know, whip it up but he can leave it as is but it's gonna be strong.  So, he gonna have to monitor what he put in and what he don't put in.

OVERTONL             And that's what, wait, that's, ahhhh.

MONTGOMERY, SR.:     Give him the -

OVERTON:             I'm just scared talking to you because I don't know what I'm talking about, and I don't want to talk on this phone.

MONTGOMERY, SR.:     Remember what I told [CC-2] for 30?

OVERTON:             I think.

MONTGOMERY, SR.:    Remember I said it's that at 30 [meaning $30 per gram]?

OVERTON:    Yeah.

MONTGOMERY, SR.:    For him [referring to the UC] it would be that at 60 or 70 [meaning $60 or $70 per gram].

OVERTON:    Yeah. He [referring to the UC] said something like that. That's why I was wondering when he said that to me, I was like I'm not even giving this to [CC-2], I'm gonna wait and give it to him. And he said it would be another week or two.

MONTGOMERY, SR.:    Yeah, yeah. You can tell him that at 70 [meaning $70 per gram], but you can tell him is what it is, what I told you it was.

OVERTON:    I think he said it was at, I think he said 60 [meaning $60 per gram] y'all did or something.

MONTGOMERY, SR.:    We did, uh, no, we did 56 [meaning $56 per gram]. You can give it to him at 56.

OVERTON:    Yeah, you right. You right. He said 56 exactly.

MONTGOMERY, SR.:    Yeah, yeah, I did, I could, I do it to him for that too.

OVERTON:    I just left him. He just met me.

*    *    *    *

OVERTON:    So, potentially [the UC] could take everything. He, he, he, he'll deal with all of that. So, when I see him in two weeks, I'ma just...

MONTGOMERY, SR.:    Yeah.

OVERTON:    [Unintelligible] deal with all of it.

11

| MONTGOMERY, SR.: | Oh.  Wait a minute.  You gonna see him in two weeks? |
| --- | --- |
| OVERTON: | Yeah.  He was like, "I probably won't be back around this way for another week or two." |
| MONTGOMERY, SR.: | Okay, well, if you gonna see him in two weeks, I'll have the whole complete mix and you'll be able to do the whole thing.  You'll be able to give him two, three hundred, as opposed to 130.  You know what I mean?  I can have you do the mix because I'll see you in between and explain everything to you.[2] |
| OVERTON: | Babe, I am not fuckin' nothing up. |
| MONTGOMERY. SR.: | Trust me.  Trust me.  You won't fuck it up. |

27.    Two days later, on or about January 10, 2025, OVERTON (using the 3227 Facility) spoke with MONTGOMERY, SR. on a recorded jail call. During this call, OVERTON and MONTGOMERY, SR. engaged in the following conversation:

| OVERTON: | Uh, remember you told me to call him [referring to the UC]?  I didn't call him, he text me cause he was like "What up, it was 33 off."  So, I said "Alright, I got you, [unintelligible] right for you next time I see you." |
| --- | --- |
| | *    *    *    * |
| MONTGOMERY, SR.: | Oh, shit.  You never checked on him [referring to the UC] the other night? |
| OVERTON: | Huh?  Your boy, [the UC]? …. |

---

2 Based on the context of this conversation, and my training and experience, law enforcement believes that in this portion of the conversation, MONTGOMERY, SR. was telling OVERTON that he wanted OVERTON to add a cutting agent to the approximately 130 grams of heroin/fentanyl powder to create a larger quantity of heroin/fentanyl powder so that they could sell that larger quantity to the UC for more money.

| | |
|---|---|
| MONTGOMERY, SR.: | Yeah. |
| OVERTON: | May bad. . . . But he text me last night. Like, I forgot all about it, but when I got home from me and [another individual] doing Pilates and looked at my phone, there was your missed call and then his text saying oh its off blah blah blah. |
| MONTGOMERY, SR.: | For that, I probably, I probably did 650 [meaning 650 blue fentanyl pills]. You heard? |
| OVERTON: | What do you mean? Extra for him? |
| MONTGOMERY, SR.: | Yeah. I probably would do 50 extra [meaning 50 additional blue fentanyl pills]. |
| OVERTON: | Oh, I was thinking that, if I owe him that 33, yeah, then I might as well do 50 extra next time, right? |
| MONTGOMERY, SR.: | Yeah. |
| OVERTON: | Yeah, I was already thinking. |
| MONTGOMERY, SR.: | Or, even to keep the peace, depending on how many it was … |
| OVERTON: | Um-huh. |
| MONTGOMERY, SR.: | I probably would do. What did he, what did he get? Five [meaning 500 blue fentanyl pills]? |
| OVERTON: | Yeah. |
| MONTGOMERY, SR.: | So, I'd do five, I might do seven [meaning 700 blue fentanyl pills]. I'd do like seven and be like, "Yo, one is to err on the side of caution, but I'm doing six [meaning 600 blue fentanyl pills] for you, you know what I mean. For now, for the future, for whenever, just to make sure that it's right." I probably would do some shit like that. Just to, like, push them on him. |

13

|  | You know what I mean?  So, be like, you can give me what you want … |
|---|---|
| OVERTON: | So, you want me to do, you want me to give him seven next time to make up for that?  But.  And then what?  Always give him six even though he's asking for five, just in case some are messed up? |
| MONTGOMERY, SR.: | No.  I would do, like, six would be so that he always owes me. |
| OVERTON: | Uh-huh. |
| MONTGOMERY, SR.: | He gonna, he gonna pay for five.  Then one he will owe me, just to keep him in my pocket.  And then one would be, another one would be for what I owed you and just to say in case anything happen in the future and shit.  You know what I mean?  I'm just making right on it now.  In case the count is off or some shit like that. |
| OVERTON: | Okay. |
| MONTGOMERY, SR.: | Cause that's what I do, like, if he giving five, I normally take, like, seven.  And be like, "Huh, I know you only asked for five, but here go seven.  We see each other on the back end." |
| OVERTON: | Uh-huh. |
| MONTGOMERY, SR.: | You know how when he was like, "Alright, this is for this, this fourteen [meaning $1,400] was for this, and that was for that"? |
| OVERTON: | Uh-huh. |
| MONTGOMERY, SR.: | That's to ensure that it's that big of a day when I'm going to travel.  You know what I mean? |
| OVERTON: | Okay. |

14

**The January 31, 2025 Undercover Purchase**

28.     On or about January 26, 2025, the UC placed a recorded telephone call to OVERTON (using the 3227 Facility).  During this call, OVERTON and the UC agreed to meet for another drug transaction sometime later that week and OVERTON asked the UC to let her know the day before so that OVERTON could "get everything together."  OVERTON also advised the UC that she still had the approximately 137 grams of fentanyl to sell to the UC.  In addition, OVERTON confirmed that she owed the UC extra blue pills for the upcoming transaction to make up for the number of blue pills that were "short" from the previous transaction that occurred on or about January 8, 2025.

29.     Later that same date, OVERTON spoke with MONTGOMERY, SR. on a recorded jail call.  During this call, OVERTON advised MONTGOMERY, SR. that the UC had called OVERTON to arrange another drug transaction for later that week.  MONTGOMERY, SR. instructed OVERTON to reach out to CC-1 to obtain another quantity of blue fentanyl pills in anticipation of OVERTON's meeting with the UC.

30.     A few days later, from on or about January 30, 2025 through on or about January 31, 2025, the UC communicated with OVERTON (using the 3227 Facility) via WhatsApp text messages and video calls.  During these communications, the UC arranged to meet with OVERTON at the Restaurant on or about January 31, 2025 to purchase the approximately 137 grams of suspected fentanyl powder from OVERTON.

31.     Prior to the transaction, law enforcement provided the UC with an amount of money to make the undercover purchase, equipped the UC with a covert recording device to record the transaction with OVERTON, and established surveillance at the Restaurant.  Thereafter, the UC proceeded to the Restaurant and met with OVERTON inside the Restaurant.

32.     During the meeting, the UC handed OVERTON a brown paper bag containing the money that law enforcement had provided for the undercover purchase and another empty, folded paper bag.  The UC advised OVERTON that the money was inside the bag, and instructed OVERTON to place the narcotics inside the empty, folded paper bag and hand it back to the UC. OVERTON then placed the narcotics inside the empty paper bag and handed it to the UC underneath the table at which they were seated.  The UC inspected the contents of the paper bag and discovered that in addition to the approximately 137 grams of suspected fentanyl powder, OVERTON had also included a clear plastic bag containing approximately 960 blue pills.  The UC informed OVERTON that he/she had only brought enough money to purchase the suspected fentanyl powder, not the blue pills.  OVERTON responded that she was providing the blue pills to the UC on consignment with the

15

understanding that the UC would pay OVERTON for the blue pills at their next meeting. Thereafter, OVERTON exited the Restaurant and departed the area.

33.    Following the undercover purchase, the suspected fentanyl powder and the approximately 960 blue pills obtained from OVERTON were submitted to a law enforcement laboratory for chemical analysis. The suspected fentanyl powder tested positive for fentanyl with a net weight of approximately 131.566 grams. The approximately 960 blue pills tested positive for cocaine and p-fluorofentanyl with a net weight of approximately 98.540 grams.

### The March 25, 2025 Undercover Purchase

34.    On or about March 5, 2025, the UC met with OVERTON inside the UC's vehicle while parked outside OVERTON's place of employment in or around Howell, New Jersey. This meeting was recorded by the UC. During the meeting with OVERTON, the UC requested to purchase an additional 2,000 blue fentanyl pills from OVERTON. OVERTON agreed to the transaction for a later date after she obtained another supply of the blue fentanyl pills from her supplier.

35.    A few days later, on or about March 9, 2025, OVERTON (using the 3227 Facility) and the UC exchanged the following WhatsApp text messages:

| Time | Sender | Recipient | Message |
|------|--------|-----------|---------|
| 3:50 p.m. | UC | OVERTON | Whas good girl |
| 3:50 p.m. | OVERTON | UC | What's up, your back? |
| 3:50 p.m. | OVERTON | UC | I don't have all yet |
| 3:51 p.m. | UC | OVERTON | How many short |
| 3:52 p.m. | OVERTON | UC | I have about 9 now [meaning 900 blue fentanyl pills]. Taking into broken might be more like 8 [meaning 800 blue fentanyl pills] |

36.    On or about March 23, 2025, the UC placed a recorded WhatsApp call to OVERTON (using the 3227 Facility) to arrange another transaction with OVERTON. During this call, OVERTON advised the UC that she was still waiting to hear back from her supplier about obtaining more of the blue

fentanyl pills. OVERTON asked the UC, "If I don't get the rest of that, do you want just what I have?" The UC responded, "Yeah, I'll take, I guess I'll take whatever's around for them blues [meaning the blue fentanyl pills]." OVERTON also told the UC that she would be able to obtain approximately 100 grams of heroin/fentanyl powder to sell to the UC. OVERTON and the UC then made arrangements to meet for the transaction at the Restaurant on or about March 25, 2025.

37.    The following day, on or about March 24, 2025, the UC again spoke with OVERTON (using the 3227 Facility) on a recorded WhatsApp call. During this call, OVERTON told the UC, in sum and substance, that she was still available to meet the UC for the transaction the next day, but that she only had the approximately 800 to 900 blue fentanyl pills (to which she previously referred to in her text message conversation with the UC on or about March 9, 2025) to sell to the UC.

38.    The next day, on or about March 25, 2025, prior to the transaction, law enforcement provided the UC with a covert recording device and an amount of money to make the undercover purchase. Law enforcement also established surveillance at the Restaurant. Thereafter, the UC proceeded to the Restaurant and met with OVERTON inside the Restaurant.

39.    During the meeting, the UC handed OVERTON a red bag containing the money that law enforcement had provided for the undercover purchase and, in exchange, OVERTON handed the UC a clear plastic bag containing approximately 672 blue pills. In addition, the UC asked OVERTON what was going on with her ability to obtain more blue fentanyl pills:

| | |
|---|---|
| UC: | And then with the blues, there's none here or what? |
| OVERTON: | Again, I'm like, I'm starting to take it personal. |
| UC: | Same dude? |
| OVERTON: | Yes! But, no, this guy kinda is like an asshole. Like, "I move when I'm ready to move." You know. So, I was like, he's just being an asshole on purpose. |
| UC: | Cause in the beginning, when we started [unintelligible] – |
| OVERTON: | It was like nothing, like – |

UC:                 - he [referring to MONTGOMERY, SR.] told me, he was like, "I got 3,000 always." I was like -

OVERTON:            That's what I mean –

UC:                 So, that's what I –

OVERTON:            - it's the same guy.

UC:                 It's not your fault, but I'm missing a move with this now. You know what I mean? Like –

OVERTON:            He's a little arrogant.

UC:                 Yeah.

OVERTON:            So, I'm like, "I'm not gonna beg you."

UC:                 No.

OVERTON:            Like, "I brought it up to you" –

UC:                 But, like, you're missing a move. I'm missing a move.

OVERTON:            Yes.

                              *   *   *   *

OVERTON:            It's like I'm stuck between "I don't want to bother you," but also, like, "I'm not gonna beg you."

UC:                 Right.

OVERTON:            But I am gonna bring it up one more time. Just to be like, "I needed that last week. So, what happened?" And see what he says.

UC:                 Right. And he was supposed to bring both of it [referring to both the blue fentanyl pills and the heroin/fentanyl powder]?

18

| OVERTON: | It's two different people. |
|---|---|
| UC: | Oh, it is two, I thought it was the same dude. |
| OVERTON: | Yeah, no, two different people. |

40.     After the meeting between OVERTON and the UC, OVERTON exited the Restaurant and departed the area.

41.     The approximately 672 blue pills purchased from OVERTON were subsequently submitted to a law enforcement laboratory for chemical analysis. The blue pills tested positive for cocaine, fentanyl, and p-fluorofentanyl with a net weight of approximately 68.6 grams.

42.     A few hours after meeting with the UC, at approximately 8:22 p.m., OVERTON (using the 3227 Facility) again spoke with MONTGOMERY, SR. on a recorded jail call.  During this call, OVERTON expressed her frustration with her narcotics suppliers, *i.e.*, CC-1 who was supposed to supply OVERTON with the blue fentanyl pills, and the other individual who was supposed to supply OVERTON with the heroin/fentanyl powder ("CC-3"):

| MONTGOMERY, SR.: | So, [CC-3] finally came through, huh? Fucking cock sucker. |
|---|---|
| OVERTON: | No!  He didn't!  That's why I said, that's why I'm so aggy tonight.  [CC-1] ignored my text messages, only said I'm not in town.  So, I didn't get any more of those [referring to the blue fentanyl pills].  And [CC-3] didn't come through either.  So, it's like I showed up with so less than I was supposed to have.  That's why I'm so annoyed. |
| MONTGOMERY, SR.: | Oh, you told him [referring to the UC] you'd call him when [unintelligible]. |
| OVERTON: | No, I'm like, "I'll let you know any developments." And he was like, "Yeah, no, I'm not like mad at you, but, you know, this, this changes, it affects you and I'm sure," he said, "it affects me and I'm sure it affects you.  Because I'm not getting this I'm not making moves I could have made." I'm like, "Yeah." He's like, |

he's like, "I'm not pissed at you because you were relying on other people to have it." I'm like, "Yeah!" He like, "So when you do, you know, if they come through and they do got it, I'm going out of town, but aint like I'm gone forever. So let me know when you got it." I'm like, "Alright." But, like, I'm only bothered by [CC-1] because, like, what the fuck! You aint said shit, but waited like two days later to write me and say I'm out of town. Like. Alright, but what the fuck? Are you getting them or not? You know what I mean?

MONTGOMERY, SR.:    Yeah.

OVERTON:    That shit is annoying, that part is fucking bothering me. You [referring to CC-1] don't say shit to me about it. Yes, "I'm out of town now." Alright dick, but were you out of town when I first fucking sent that shit? And are you back in town? Like, you're really just ignoring me and I'm stuck between, I even told him this because it's the truth, I'm stuck between I don't want to bother him and I'll be damned if I beg you. Like, what the fuck? How many times am I gonna ask you?

\*   \*   \*   \*

MONTGOMERY, SR.:    I know this time around, when [CC-1] does, he's not acting like a asshole, you gotta get like 10,000 [referring to 10,000 blue fentanyl pills].

OVERTON:    Word. Only because the comment he [referring to the UC] made to be was, "That's crazy, when it started he [referring to MONTGOMERY, SR.] acted like he would always have 3,000 on the go."

MONTGOMERY, SR.:    I did.

**The April 27, 2025 Undercover Purchase**

43.    On or about April 23, 2025, beginning at approximately 7:09 p.m., OVERTON (using the 3227 Facility) exchanged the following text messages with the UC over WhatsApp:

| Time | Sender | Recipient | Message |
|---|---|---|---|
| 7:09 p.m. | OVERTON | UC | Finally replenishing [with an emoji of a red and white prescription pill] |
| 7:10 p.m. | UC | OVERTON | That's what's up how long till they back up |
| 7:21 p.m. | OVERTON | UC | Getting today but I'm gonna have the convo that I need this to me on the regular and not just fall off disappear |
| 7:37 p.m. | UC | OVERTON | Facts |
| 7:37 p.m. | UC | OVERTON | U lmk [meaning, "let me know"] |
| 7:42 p.m. | OVERTON | UC | Definitely |

44.    The following day, on or about April 24, 2025, at approximately 9:52 a.m., OVERTON (using the 3227 Facility) sent a text message via WhatsApp to the UC stating, in sum and substance, that she had received 2,000 fentanyl pills that she was ready to sell to the UC.

45.    A few hours later, at approximately 12:19 p.m., the UC placed a recorded call to OVERTON (using the 3227 Facility) via WhatsApp. During this call, the UC asked OVERTON if she could obtain another 1,000 fentanyl pills from her supplier. OVERTON responded that she would inquire with her supplier and let the UC know.

46.    Later that same date, at approximately 10:22 p.m., OVERTON (using the 3227 Facility) sent a text message via WhatsApp to the UC stating, in sum and substance, that she was only able to obtain an additional 400 fentanyl pills from her supplier.

47.    Thereafter, from on or about April 26, 2025 through on or about April 27, 2025, the UC had multiple communications with OVERTON (using

the 3227 Facility) via WhatsApp. During these communications, the UC made arrangements to meet OVERTON at the Restaurant on or about April 27, 2025 for the purpose of purchasing the approximately 2,400 fentanyl pills from OVERTON.

48.    Prior to the transaction, on or about April 27, 2025, law enforcement provided the UC with a covert recording device and an amount of United States currency for the undercover purchase. Law enforcement also established surveillance at the Restaurant. Thereafter, the UC proceeded to the Restaurant and met with OVERTON inside the Restaurant.

49.    During the meeting, the UC handed OVERTON a red bag underneath the table at which they were seated. OVERTON then produced a large plastic bag containing a quantity of blue pills, placed it inside the red bag, and handed the red bag back to the UC underneath the table. OVERTON informed the UC that she believed that the plastic bag did not contain the full amount of blue fentanyl pills that the UC had agreed to purchase and, therefore, told the UC not to give her the money for this transaction until the UC had counted the pills that she had provided. Thereafter, OVERTON exited the Restaurant and departed the area.

50.    Following the undercover purchase, law enforcement discovered that the large plastic bag that OVERTON provided to the UC contained two separate smaller bags, each containing a quantity of blue colored pills. Law enforcement then counted the suspected fentanyl pills obtained from OVERTON and discovered that OVERTON provided the UC with only approximately 1,249 blue pills – one bag contained approximately 861 blue pills, and the other bag contained approximately 388 blue pills.

51.    The approximately 1,249 blue pills obtained from OVERTON were subsequently submitted to a law enforcement laboratory for chemical analysis. The blue pills from the bag containing approximately 861 blue pills bag tested positive for heroin with a net weight of approximately 98.5 grams. The blue pills from the bag containing approximately 388 blue pills tested positive for cocaine and p-fluorofentanyl with a net weight of approximately 40.8 grams.

52.    Thereafter, on or about April 28, 2025 the UC and OVERTON (using the 3227 Facility) exchanged the following text messages over WhatsApp:

| Time | Sender | Recipient | Message |
|------|--------|-----------|---------|
| 12:40 p.m. | UC | OVERTON | Big light |
| 12:40 p.m. | UC | OVERTON | Like 1100 light |

| 12:42 p.m. | OVERTON | UC | So it was only 1300 |
| 12:42 p.m. | UC | OVERTON | Yup |

53.    Approximately five days later, on or about May 3, 2025, OVERTON (using the 3227 Facility) and the UC exchanged the following WhatsApp text messages:

| Time | Sender | Recipient | Message |
| --- | --- | --- | --- |
| 5:15 a.m. | OVERTON | UC | Omg I have the rest |
| 5:15 a.m. | OVERTON | UC | I'm looking thru stuff and I have another bag here |
| 5:16 a.m. | OVERTON | UC | So I'll give to you when ever you wanna get |
| 12:02 p.m. | UC | OVERTON | Hahaha stop |
| 12:02 p.m. | UC | OVERTON | All good imma come see u this week then |
| 12:02 p.m. | UC | OVERTON | Going to Florida for a few days but I'll b back n hyu [meaning, "hit you up"] |

54.    That same day, at approximately 9:50 a.m., OVERTON (using the 3227 Facility) also spoke with MONTGOMERY, SR. on a recorded jail call. During this call, OVERTON told MONTGOMERY, SR. that that she found the "rest of the shit" earlier that morning hidden in one of her other bags.

**The May 15, 2025 Undercover Purchase**

55.    On or about May 7, 2025, OVERTON (using the 3227 Facility) spoke with MONTGOMERY, SR. on a recorded jail call. During the call, MONTGOMERY, SR. told OVERTON about a conversation he had with CC-1:

MONTGOMERY, SR.:    He seems to, uh, think that when I told him like a specific number, the number I told him, so that you not, like, uh, you know, [unintelligible] at his whim.

23

| OVERTON: | Um-hum. |
| MONTGOMERY, SR.: | He's trying to say like, and I get it, he's trying to say like, "Yo, listen, she might not be telling you this, but she may not want that much." |
| OVERTON: | Oh, I did tell you that I don't want that much.  You don't remember? |
| MONTGOMERY, SR.: | Yeah, yeah. |
| OVERTON: | Okay. |
| MONTGOMERY, SR.: | So, he's like, "Yo, no, I'm just going do, uh, you know, five [meaning 5,000 blue fentanyl pills].  Five and all this other shit."  He was telling me, "I'ma do five and so that way, you know, she be alright, she just tell me whenever."  And I was like, "Alright."  Then he explained to me why and everything, which makes sense. |

56.    Thereafter, from on or about May 10, 2025 through on or about May 15, 2025, the UC had multiple WhatsApp text message communications with OVERTON (using the 3227 Facility).  During these communications, the UC made arrangements to meet OVERTON at the Restaurant on or about May 15, 2025 for the purpose of obtaining another quantity of blue fentanyl pills from OVERTON.

57.    Prior to the transaction, law enforcement provided the UC with a covert recording device and an amount of money to make the undercover purchase from OVERTON.  Law enforcement also established surveillance at the Restaurant.  Thereafter, the UC proceeded to the Restaurant and met with OVERTON inside the Restaurant.

58.    During the meeting, the UC reached underneath the table at which they were seated and handed OVERTON two red bags, one of which was empty and the other containing the money that law enforcement had provided for the undercover purchase, which represented the payment for the approximately 1,300 blue fentanyl pills that OVERTON had provided to the UC on consignment during the previous undercover purchase on or about April 27, 2025.  OVERTON then produced a plastic bag containing the approximately 1,100 blue pills that were short from the previous undercover purchase, placed it inside the empty red bag, and handed that red bag back to the UC underneath the table.  Thereafter, OVERTON asked the UC to give her the red

bag once again.  The UC then handed OVERTON the red bag, at which time OVERTON produced several additional large plastic bags (containing a total of approximately 4,000 blue pills), placed them inside the red bag, and handed the red bag back to the UC underneath the table.  OVERTON provided all of the approximately 5,100 blue pills to the UC on consignment.

59.    Following the undercover purchase, OVERTON exited the Restaurant and departed the area.

60.    The approximately 5,100 blue pills that the UC obtained from OVERTON were subsequently submitted to a law enforcement laboratory for chemical analysis.  The blue pills tested positive for heroin with a net weight of approximately 584.4 grams.